UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.R. AUTOMATION TECHNOLOGIES, LLC, a Delaware limited liability company,<br><br>　　　Plaintiff,<br><br>v.<br><br>STEVE SARCHET and DAN BRCIC,<br><br>　　　Defendants. | Civ. Act. No.<br><br><br><br><br><br>**COMPLAINT** |

Plaintiff J.R. AUTOMATION TECHNOLOGIES, LLC ("JRA"), by and through its undersigned counsel, and for its First Amended Complaint states as follows:

**NATURE OF THE CASE**

1.　This case arises out of the raid of JRA's senior management team by a competitor and the Defendants' blatant, systematic, and continuing disregard for their contractual obligations to JRA.

2.　JRA is a member of the JR Technology Group, LLC ("JRT Group"), a global leader in manufacturing automation solutions. From its global headquarters in Holland, Michigan, and facilities around the world, JRT Group has designed, built, tested, and installed custom automation solutions for leading companies across five continents.

3.　In partnership with its parent company, Hitachi, Ltd. ("Hitachi"), JRT Group continuously drives innovation. Hitachi's digital expertise, including data and IoT,[1] enhances

---

[1] "Internet of Things."  *See, e.g.,* https://hitachids.com/service/iot-services/#services. Essentially, a network of devices that can sense, communicate, and exchange data with other devices and systems.

automation on the factory floor by providing real-time insights, predictive maintenance, and seamless integration of processes, leading to increased efficiency and reduced downtime.

4.      These technologies enable JRT Group to deliver even more precise monitoring and control, optimizing resource use and minimizing waste. On a global scale, data and IoT-driven automation can develop sustainable solutions, such as energy-efficient systems and smart grids, helping to address environmental challenges and reduce carbon footprints.  Put another way, JRT Group, through its historical status as an industry leader coupled with Hitachi's digital and data expertise, is positioned to provide problem-driven automation solutions to customers in a way that its competitor simply cannot do.

5.      Each Defendant is a former high-level executive or employee of JRA who previously had broad, if not unfettered, access to JRA's most confidential business information and had significant responsibility with respect to building JRA's business and interfacing with its customers.  This included, but was by no means limited to, access to JRA's customer lists, business plans, financial data, strategic planning information, product specifications, bid and pricing information, and similar, highly confidential information about JRA, its customers, suppliers, and overall business strategies (collectively, the "Confidential Information").  Each Defendant was also highly compensated.

6.      In light of Defendants' broad access to JRA's Confidential Information, each Defendant was subject to a Management Incentive Unit Agreement ("MIU Agreement").  Among other things, each Defendant's MIU Agreement included restrictive covenants, including strict confidentiality, non-competition, non-solicitation, and non-disparagement restrictions (collectively, the "Restrictive Covenants").  The Restrictive Covenants prohibited the Defendants

from competing with JRA or soliciting JRA's customers and employees for a period of 12 months after their respective employment with JRA ended, for any reason.

7. Despite these unequivocal obligations, JRA has learned that each Defendant has flagrantly violated his contractual obligations to JRA and has chosen to work for a direct competitor of JRA, Axis Automation ("Axis"); like JRA, Axis is involved in the business of industrial automation.

8. Worse yet, in the wake of Defendants unlawfully absconding to Axis, *twenty-eight* former JRA employees resigned their employment with JRA and immediately accepted similar positions with Axis, clear evidence of improper solicitation by one or more of the Defendants.

9. This lawsuit seeks to recover the extensive damages caused by Defendants' undisputed breach of their contractual obligations to JRA, together with specific performance of their Restrictive Covenants, pursuant to the plain language of each Defendant's MIU Agreement.

## THE PARTIES

10. Plaintiff, JRA, is a Delaware limited liability company with its principal place of business in Holland, Michigan. JRA's sole member is not a citizen of any state where any Defendant resides.

11. Prior to his departure from JRA, each Defendant was employed at JRA's global headquarters in Michigan.

12. Defendant Steve Sarchet ("Sarchet") is a resident of the State of Michigan. Prior to his resignation, Sarchet served as JRA's Senior Account Manager. He currently serves as a Business Development Manager for Axis.

13. Defendant Dan Brcic ("Brcic") is a resident of the State of Michigan. Prior to his resignation, Brcic served as JRA's Senior Account Manager. After his departure from JRA, he

served as a Business Development Manager for Axis. He currently has an identical position with another JRA competitor, Huizenga Group Automation ("Huizenga").

## JURISDICTION AND VENUE

14. This civil action is between citizens of different states, as prescribed by 28 U.S.C. § 1332(a)(1). This Court has subject matter jurisdiction, as the parties are diverse and the amount in controversy exceeds $75,000.

15. The Court has personal jurisdiction over all parties, as Defendants specifically consented to jurisdiction in the State of New York as part of the MIU Agreements.

16. Venue of this civil action in this District is proper, as the parties agreed that any suit arising out of the MIU Agreements would be brought in "any state or federal court sitting in New York County in New York State."

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

17. This case arises out of the breach of Defendants' MIU Agreements with JRA, which contained express, enforceable non-disclosure, non-solicitation, and non-competition restrictions.

18. JRA is a leader in manufacturing automation, with its headquarters located in Holland, Michigan.

19. JRA was formed as a Delaware limited liability company on February 4, 2015.

20. Through a series of subsequent acquisitions and a relentless dedication to innovation and customer support, JRA has grown into a global leader in industrial automation.

21. Over the years, JRA has been managed by a large team of talented executives and other high-level employees, including Defendants. This leadership team has nearly unfettered access to every aspect of JRA's business, including its Confidential Information.

22. During their time with JRA, Defendants had extensive responsibility for running, managing, and growing nearly every aspect of JRA's business, using the company's most sensitive information.

23. For instance, as Senior Account Managers for JRA, both Sarchet and Brcic were responsible for maintaining customer accounts and growing the company's business, using JRA's Confidential Information.

24. Again, each of the Defendants was in a high-level executive or leadership position with JRA, and his job required near daily, extensive use of the company's Confidential Information. To protect its Confidential Information, JRA required each of the Defendants to sign an MIU Agreement. A copy of each Defendant's MIU Agreement is attached as **Exhibits A-B**.

25. Among other things, the MIU Agreement prohibited Defendants from using or disclosing the JRT's Confidential Information:

> (a) Confidentiality. During the course of Executive's employment with the Company or any of its Subsidiaries, Executive will have access to Confidential Information. For purposes of this Agreement, "Confidential Information" means all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company or any of its Affiliates, *including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors and/or competitors*. Executive agrees that Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any Person, other than in the course of Executive's assigned duties and for the benefit of the Company, either during the period of Executive's employment or at any time thereafter[.] …

*Id.* at § 5(a) (emphasis added).

      26.      The Defendants' MIU Agreements also prohibited them from competing with the company for a period of 12 months after their departure from the company for any reason:

> (b) <u>Non-Competition</u>. Executive acknowledges that (i) Executive performs services of a unique nature for the Company and its Affiliates that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Company, (ii) ***Executive has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against the Company or any of its Affiliates***, *(iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such Confidential Information, (iv) the Company and its Affiliates have substantial relationships with their customers and Executive has had and will continue to have access to these customers, (v) Executive has received and will receive specialized training from the Company and its Affiliates, and (vi) Executive has generated and will continue to generate goodwill for the Company and its Affiliates in the course of Executive's employment*. Accordingly, during Executive employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter, Executive agrees that *Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any Person, firm, corporation or other entity, in whatever form, engaged in competition with the Company or any of its Subsidiaries* or in any other material business in which the Company or any of its Subsidiaries is engaged on the date of termination or in which they have planned, on or prior to such date, to be engaged in on or after such date, in any locale of any country in which the Company or any of its Subsidiaries conducts business. Notwithstanding the foregoing, nothing herein shall prohibit Executive from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation engaged in a business that is in competition with the Company or any of its Subsidiaries, so long as Executive has no active participation in the business of such corporation.

*Id.* § 5(b) (emphasis added).

27. Finally, the MIU Agreements prohibited Defendants from soliciting JRA's customers or employees for a period of 12 months following their departure from the company for any reason:

> (c) <u>Non-Solicitation; Non-Interference</u>. During Executive's employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter, Executive agrees that Executive shall not, except in the furtherance of Executive's duties to the Company or any of its Subsidiaries, ***directly or indirectly, individually or on behalf of any other Person, firm, corporation or other entity, (i) solicit, aid or induce any customer of the Company or any of its Subsidiaries to purchase goods or services then sold by the Company or any of its Subsidiaries from another Person, firm, corporation or other entity or assist or aid any other Person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any employee, representative or agent of the Company or any of its Subsidiaries to leave such employment or retention or to accept employment with or render services to or with any other Person, firm, corporation or other entity unaffiliated with the Company*** or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other Person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent, or (iii) interfere, or aid or induce any other Person or entity in interfering with the relationship between the Company or any of its Subsidiaries and any of their respective vendors, joint venturers or licensors. …

*Id.* at § 5(c) (emphasis added).

28. The Defendants expressly agreed that these restrictions were "necessary for the reasonable and proper protection of the Company and its Affiliates and their Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time, and geographic area[.]" *Id.* at § 5(f).

29. Further, the Defendants agreed that in the event of a breach, in addition to any remedies at law, JRA would be entitled to obtain injunctive relief, specific performance, and to

7

recover its reasonable attorneys' fees incurred in connection with any action to enforce the MIU Agreements. *Id.* at § 5(j).

30. Finally, the MIU Agreements stated that in the event of a breach of Defendants' Restrictive Covenants, the restricted period for those covenants would be tolled and extended by a period of time equal to each Defendant's breach. *Id.* at § 5(h).

31. In exchange for these restrictions, which the parties agreed were both necessary and reasonable to protect JRA's legitimate business interests, each Defendant was highly compensated. In addition to substantial base salaries, each Defendant was awarded a certain number of Management Incentive Units, representing equity in the company.

## **THE HITACHI ACQUISITION AND DEFENDANTS' RESIGNATIONS**

32. On December 27, 2019, Hitachi acquired JRA Group, including JRA itself, from JRA's former parent entity, the New York-based investment group, Crestview Partners.

33. The acquisition benefitted both Hitachi and JRA through the combination of JRA's historical expertise in industrial automation with Hitachi's digital expertise, which allowed each company to be even more inventive and efficient for customers.

34. Unfortunately, several years after the Hitachi transaction, and over the course of approximately six (6) months, Defendants resigned from their high-level positions with JRA.

35. As JRA would subsequently learn, each Defendant subsequently accepted an identical, or substantially similar, position with Axis, a direct JRA competitor. Brcic then accepted a substantially similar position with Huizenga, another competitor of JRA.

36. In the wake of these resignations, *twenty-eight* former JRA employees resigned. They immediately accepted similar positions with Axis. Upon information and belief, these

employees were solicited by one or more of the Defendants, yet another breach of their obligations to JRA under the MIU Agreements.

37. As a result of Defendants' improper competition with JRA, their actual and/or inevitable use of JRA's Confidential Information to benefit Axis and/or Huizenga, and their subsequent solicitation of JRA's customers and employees, Defendants have breached their contractual obligations to JRA under the MIU Agreements.

38. As a result of Defendants' breaches, JRA has been damaged. This lawsuit is the result.

## COUNT I – BREACH OF CONTRACT

39. The allegations in the preceding paragraphs are incorporated by reference as if fully restated herein.

40. MIU Agreements are valid, enforceable contracts.

41. JRA has fulfilled all of its obligations under the MIU Agreements.

42. In soliciting JRA's employees and customers, and in competing against JRA, and as a result of Defendants' actual and/or inevitable use of JRA's Confidential information, Defendants have breached the MIU Agreements.

43. As a result of Defendants' breaches, JRA has been damaged.

WHEREFORE Plaintiff, JRA, requests judgment in its favor, and against Defendants, in an amount in excess of $75,000, and such further relief, including injunctive relief and specific performance, which the Court deems equitable, including all costs and attorneys' fees incurred in connection with this action.

|  |  |
|---|---|
| Dated: June 12, 2025 | Respectfully submitted,<br><br>VARNUM LLP<br><br>Timothy P. Monsma (MI P72245, *pro hac vice pending*)<br>Hannah A. Cone (MI P87285, *pro hac vice pending*)<br>P.O. Box 352<br>Grand Rapids, MI 49501<br>(616) 336-6000<br>tpmonsma@varnumlaw.com<br>hacone@varnumlaw.com<br><br>and<br><br> /s/ *Tod S. Chasin*<br>Scott A. Ohnegian, Esq. (SO-4799)<br>Tod S. Chasin, Esq. (TC-0122)<br><br>RIKER DANZIG LLP<br>489 Fifth Avenue, 33rd Floor<br>New York, NY 10017-6111<br>Telephone: (212) 5302-6574<br>tchasin@riker.com<br>sohnegian@riker.com<br><br>*Attorneys for Plaintiff,*<br>*J.R. Automation Technologies, LLC* |

4908-0233-4285, v. 1